IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No. 02-cv-01533-WYD-BNB

JOHN A. DEGRADO,

     Plaintiff,

v.

JEFFERSON PILOT FINANCIAL INSURANCE COMPANY, a Nebraska Corporation,

     Defendant.

---

**FINAL ORDER ON REVIEW OF ADMINISTRATIVE RECORD**

---

I.     <u>INTRODUCTION</u>

     This case arises under the Employee Retirement Income Security Act of 1974,

29 U.S.C. § 1001, *et seq.* ["ERISA"].  The Complaint filed by John DeGrado ["Plaintiff"]

or ["DeGrado"] seeks an increase in benefit payments under a long term disability

["LTD"] plan purchased by his previous employer, Sloans Lake Management

Corporation ["Sloans"].

     The decision regarding benefits was made by Defendant Jefferson Pilot Financial

Insurance Company ["Jefferson"], who is both the plan administrator and the insurer of

the benefits.  While Jefferson initially treated the claim as a "new" claim, it later switched

course and ultimately treated Plaintiff's claim as a "recurrent" claim under the policy at

issue.  The decision to treat the claim as "recurrent" provided Plaintiff substantially less

benefits than if the claim had been treated as a "new" claim, and thus benefitted

Jefferson financially.

The benefits determination was originally ruled on by Judge Figa.  *See DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 367 F. Supp. 2d 1315 (D. Colo. 2005).  He reversed Jefferson's decision, finding it to be arbitrary and capricious, and awarded Plaintiff the increased benefits.  *Id.* at 1324-28.  On appeal, the Tenth Circuit reversed Judge Figa's decision.  *See DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 415 F.3d 1161 (10th Cir. 2006).  While the Tenth Circuit agreed that Jefferson's decision to treat Plaintiff's claim as "recurrent" rather than "new" was arbitrary and capricious, it found that the case needed to be remanded to Jefferson for it to state the facts it relied on in making its decision.  *Id.* at 1174-1176.  These decisions are discussed in more detail below.  Judge Figa thus remanded the case to Jefferson to make further findings consistent with the Tenth Circuit's decision.

On December 11, 2007, Jefferson issued a new decision again treating the claim as "recurrent" rather than new and denying the increased benefits Plaintiff seeks.[1]  The parties have filed cross-motions for summary judgment seeking review of this decision.

## II.  FACTUAL BACKGROUND PRE-REMAND

The facts of this case pre-remand (before the case was remanded to Jefferson to make a new decision) are set out in detail in both Judge Figa's Final Order and the Tenth Circuit's decision.  As found in those decisions and in the administrative record, Plaintiff is a  forty-three year old man[2]  who, in 1991, began suffering from ulcerative

---

[1]  This decision was actually made by a representative of Lincoln Financial Group, the successor to Jefferson.  For purposes of this decision, I will refer to the decisionmaker as Jefferson.

[2]  Plaintiff's date of birth is stated in the record as either October 3 or 5, 1965 (Administrative Record, hereinafter referred to as "AR", 474, 1006).

colitis and/or Crohn's disease.[3]  *DeGrado*, 451 F.3d at 1163.  In the early phases of his

disease, DeGrado experienced periodic flare-ups of symptoms (e.g., diarrhea,

abdominal pain, bloody stools, fatigue) lasting from a few weeks to a few months,

followed by periods of remission.  *Id*.  In 1997, DeGrado began working for Sloans as

Manager of Strategic Marketing, an executive position, and was compensated by base

salary and sales commissions as opposed to being paid hourly.  *Id*.

On April 14, 1999, Plaintiff temporarily stopped working due to symptoms he was

experiencing from his disease.  *Id*.  He was absent from work from April 1999 through

September 1999.  *Id*.  In July 1999, Plaintiff submitted a claim for benefits under a LTD

policy [the "Policy"] issued to Sloans by Guarantee Life Insurance Company

["Guarantee"].  *Id*.  His claim was denied in September 1999, after he had returned to

work.  *DeGrado*, 367 F. Supp. 2d at 1317.  He protested the denial and in a letter dated

January 25, 2000, Guarantee reversed its position and allowed benefits for the period

from January 13, 1999 through September 20, 1999, taking into account the 90-day

elimination period (AR 100).  *Id*.[4]  Guarantee ultimately paid that claim in early 2000.

*DeGrado*, 451 F.3d at 1163.

Plaintiff returned to work on September 20, 1999.  *Id*.  Plaintiff asserts that he

worked on a part-time basis through December 1999, and then on a full-time basis

---

[3]  Both parties filed extensive "Statements of Undisputed Facts" as required by my Practice
Standards.  Since each party contested many of the "undisputed facts" relied on by the opposing party, I
have relied on the administrative record, where appropriate, to resolve many of these conflicts.  *See
Adamson v. Unum Life Ins. Co. of America*, 455 F.3d 1209, 1212 (10th Cir. 2006) (in ERISA cases, review
is confined to the administrative record).

[4]  The elimination period is the period of time an employee must be out of work before the benefits
start.

through November 2000.  This is disputed by Defendant, and is the key issue before the

Court in this case.  At some point in 2000, Plaintiff's symptoms began to reappear and

gradually worsened.  *Id.*  In late November 2000, Plaintiff concluded he could not

continue to carry out his job duties due to his physical symptoms.  *Id.*  Accordingly,

Plaintiff ceased working in November 2000 and submitted a second disability claim.  *Id.*

That claim is the subject of this decision.  By that time Jefferson had merged with

Guarantee and had taken over responsibility for administering and paying claims under

the Policy.  *Id.* at 1163-64.

Jefferson investigated Plaintiff's claim.  In February 2001, DeGrado spoke to

Jefferson representative Mary Beth Brenehy ["Brenehy"] concerning his claim in

unrecorded phone calls.[5]  The notes of one conversation indicate that: Plaintiff "really

could have gone back out on claim jan. 2000 because it was at that point that he started

working only 10-15 hours per week at home. he said his employer continued paying his

full salary because they knew that he was having health problems, and whatever he

could work would be fine, that they would continue to pay him. I again verified that he

was only working 10-15 hours per week from jan. 2000 to Nov. 2000, and he wanted me

to know that he was still considered a full-time employee, and that was something that

his er agreed to do with him. . . ." (AR 1696).

The record also contains other notes of phone conversations between Brenehy

and Plaintiff in February and March 2001.  Brenehy stated in those notes that "I advised

---

[5]  While the calls were not actually recorded, Jefferson's representatives transcribed the contents
of the call into the DOCS claim system.

[a representative of Sloans] that John told me he has worked from home since Jan. 2000, working 10-15 hours per day") (AR 1715) and that Plaintiff told her "it was by the grace of god that they continued to pay him, and even though he was not working 40 hours per week, he was still considered a full-time [employee]. . . . I advised him that in order to be eligible for benefits, the policy has a min. no. of hours that have to be worked ea. week, and that that number is 30. He said that would be no problem") (AR 1704); *see also* AR 1728-29.) Despite the above notes, Brenehy wrote in an e-mail dated February 28, 2001 to Jefferson's reinsurer, "since there is no one at the company to verify he was working part-time, and since the payroll records reflect that he was full-time through December 2000, I think we would be hard pressed to prove that he was ineligible due to not working 30 hours per week" (AR 1415).

On March 1, 2001, Jefferson sent a letter to Plaintiff rejecting his claim for disability benefits (AR 1295-97). *Id.* at 1164. According to the Tenth Circuit, "[i]n the letter, Jefferson concluded that Degrado's claim was one for a new period of disability beginning on November 28, 2000." *DeGrado*, 451 F.3d at 1164. The letter treated the claim as a new claim "because "payroll records reflect that [plaintiff was] working a fairly regular schedule up until November 2000 ...." (AR 1296-97). *Id.* Thus, DeGrado was required to provide medical evidence of a severity of impairment to support a finding of total disability as of November 2000, and the letter concluded that his medical records did not support such a finding.[6]

---

[6] Specifically, Jefferson concluded that Plaintiff "d[id] not have a severity of impairment to support Total Disability" under the Policy (AR at 1295). Jefferson discussed certain medical records and concluded that "the objective medical records d[id] not support that [DeGrado] had a severity of

Plaintiff, proceeding pro se, again protested the denial to the Colorado Division of Insurance. *DeGrado*, 451 F.3d at 1164. Jefferson treated the protest as an appeal (*id.*) and on April 9, 2001, sent Plaintiff a letter affirming its decision to deny him disability benefits (AR 1300-02). This letter was authored by Disability Appeal Specialist Cindy Daly ["Daly"]. *Id.* Jefferson found that Plaintiff's Crohn's disease had improved, there were no medical records indicating that his polyarthritis and seronegative arthritis rendered him totally disabled, and there was no "objective medical documentation supporting a diagnosis of Fibromyalgia or that this diagnosis precluded [DeGrado] from performing [his] occupation" (*id.* 1301). Thus, Jefferson again concluded that "the records . . . failed to support a severity of impairment . . . at the time [DeGrado] stopped working." *Id.* The letter also stated:

> Under this claim, you stopped working on 11/27/00. * * * Although you indicated previously that you felt this should be considered a continuation of your previous claim, *all information we have been able to obtain indicates you returned to work full-time after your last claim for longer than 6 months, therefore resulting in a new, separate claim.*

*Id.* 1300 (emphasis added).

Plaintiff obtained counsel and, on July 31, 2001, formally appealed the decision and submitted additional medical records (AR 1106-10). *DeGrado*, 451 F.3d at 1164. The Tenth Circuit found it notable that Plaintiff did not challenge the finding that the November 28, 2000 claim was a "new, separate claim," *i.e.*, independent from the first disability claim. *Id.* He only challenged the finding that he was not totally disabled. *Id.*

---

impairment [as of November 28, 2000] ... that would prevent [him] from performing the main duties of [his] occupation. . . ." (AR at 1297).

In early September 2001, Jefferson sent Plaintiff's medical records to Dr. Jay

Benson, a gastroenterologist, for a "peer review" (AR 1087). *Id.* Jefferson asked

Dr. Benson to review the records and determine "if there [wa]s severity of impairment

that would render . . . DeGrado UNABLE TO PERFORM his occupation as a manager

of strategic marketing beginning 11-28-2000". *Id.*

On October 8, 2001, Dr. Benson sent a letter to Jefferson which stated:

> The GI manifestations of [Degrado's] colitis, except during acute flareups,
> should not produce significant disability. On the other hand, the patient has
> major functional limitations secondary to seronegative arthritis and a
> fibromyalgia syndrome that includes extreme fatigue and weakness. . . .

(AR 1059.)

By letter dated December 13, 2001, Jefferson's Risk Service Manager, Ruth

Hagemann ["Hagemann"], advised Plaintiff that based on his appeal Jefferson had

reconsidered its prior decision and made a "favorable determination" concerning his

disability claim (AR 999-1000). *DeGrado*, 451 F.3d at 1165. The letter "determined that

[DeGrado] is totally disabled and his disability will be considered a recurrent disability . .

. ." (as compared to a new claim) (AR 999-1000). Although dated December 13, 2001,

the letter was sent on or after December 18 and received by DeGrado's counsel on

December 21, 2001 by overnight mail (AR 0971).

Contrary to the conclusion reached earlier in the year, Hagemann concluded that

Plaintiff had not worked full-time for at least six months since returning to work after his

first period of disability. She stated:

> Information in the file indicates Mr. DeGrado originally was totally disabled
> from 04/14/1999 to 09/20/1999. His claim was then closed as we were

advised he had returned to work full time (09/21/1999). We subsequently were advised that Mr. DeGrado began missing time from work around January 5, 2000, due to the same diagnosis. We were advised that Mr. DeGrado's employer was paying full time wages, but that he was working less than full time. Since Mr. DeGrado returned to his regular occupation on a full-time basis for less than six months, and because his disability is due to an injury or sickness which is the same as, or related to the cause of his original disability, his disability is considered a recurrent disability and the original claim will be reopened with consideration of benefits from January 5, 2000 to the current date.

(AR 999).

Neither the letter nor any document in the claim file explains why the original claim, closed on January 27, 2000 based upon the employer's January 25th representation that DeGrado had returned to work, was reopened to January 5th. Although Jefferson asserts that there is evidence in the record that Plaintiff stopped working full-time in January 2000 and that it relied on Plaintiff's January 5, 2000 e-mail to the Colorado Department of Insurance that he was getting sick again (AR 0125), I find that there is nothing in the record that suggests that Plaintiff's Date of Disability was actually January 5, 2000.

At no time after the second denial of the claim in April 2001 and before issuance of the December 2001 letter was Plaintiff notified that Jefferson was reconsidering its unappealed decision that the second claim was for a "new" period of disability.

Claim file notes made subsequent to the July 2001 second appeal show that Jefferson continued for some time to take the position that the second claim was a "new," not "recurrent" period of disability (AR 1083—August 2001 note, ". . . with this not being a recurrent claim), 1008—December 2001 note referring to "The new claim").

Also, at some time prior to the December 13, 2001 letter, Jefferson's adjuster Susan Wharton ["Wharton"], who was not assigned to handle Plaintiff's appeal, prepared benefit calculations which compared potential payable benefits due to age 65 if the claim were treated as a "new" period of disability versus what the potential payout would be if the claim were handled as a "recurrent" disability (AR 1004-1007). The calculation showed that if the claim were treated as "recurrent," the benefit level could be calculated from Plaintiff's 1998 earnings as established by Sloans' payroll records, and would result in a total potential exposure to Jefferson, net of social security benefits, of approximately $610,000. If Jefferson were to continue treating the claim as a "new" period of disability, as it had been doing from the outset of the second claim, Jefferson would face a total potential payout, net of social security benefits, of over $2.8 million (*id*.). *DeGrado*, 451 F.3d at 1165.[7] The Tenth Circuit concluded that this calculation was prepared at some point before October 3, 2001. *Id*.

Further, as reflected in undated file notes, Hagemann wrote: "Susan's help Handle as Recurrent" (AR 1008). It is unclear whether this entry was made shortly before Wharton's calculation or shortly thereafter. I find it was, however, made prior to the December 2001 determination letter which treated the claim as "recurrent". In another file dated December 18, 2001, there is a claim entry stating, "JHA, Legal Risk area have agreed to overturn denial, however, since claimant states, and Dr. states that

---

[7] As noted by the Tenth Circuit, DeGrado's base salary was approximately the same in the twelve-month period preceding each of his two disability claims. However, his sales commissions were substantially greater in the year preceding his second disability claim than in the year preceding his first disability claim. *Id*. at 1165 n. 1.

his fatigue goes back to his earlier disability, will pay as recurrent" (AR 0011). JHA, the reinsurer for the Sloans' Plan, becomes involved in the claim decision-making only when the monthly benefit is more than $5,000 (AR 0893).

The policy provides coverage to an employee who was not Actively-At-Work due to Injury or Sickness (AR 0095). "Active work" or "Actively-at-Work" means an Employee's full-time performance of all main duties of such Employee's occupation at the Employee's usual place of business or any other business location to which the Employer requires the Employee to travel (AR 0070). To be "Totally Disabled" under the policy and entitled to full benefits, a claimant must demonstrate that "due to an Injury or Sickness [he] is unable to perform each of the main duties of his . . . regular occupation" (AR 0085).

The policy defines a "Recurrent Disability" as "a Disability due to an Injury or Sickness which is the same as, or related to, the cause of a prior Disability for which Monthly Benefits were payable". Recurrent Disability will be treated as follows:

> 1. A Recurrent Disability will be treated as a new period of Disability, and a new Elimination Period must be completed before further Monthly Benefits are payable; if the Insured Employee returns to his or her regular occupation on a full-time basis for six months or more.

> 2. A Recurrent Disability will be treated as part of the prior Disability, if an Insured Employee returns to his or her regular occupation on a full-time basis for less than six months."

(AR 90).

Under the Recurrent Provision, if a claimant returns to work on a full-time basis for less than six months, his benefit payments will begin again as of his first day of

Disability and the calculation of his renewed monthly benefit payments will be the same as it was during the prior disability. *DeGrado*, 451 F.3d at 1169. If a claimant works on a full-time basis for six months or more, his benefit payments will begin after the Elimination Period is satisfied, and will be calculated as they would for a new claim. *Id.*

Jefferson's December 13, 2001 letter found Plaintiff disabled under sub-paragraph 2 of the above definition, that is, as part of the prior Disability. The letter advised that Plaintiff's benefit would be 66.67% of "his basic monthly earnings, less other sources of income. 66.67% of DeGrado's basic monthly earnings at the date his disability originally began would be equal to $3,750.19" (AR 1000). This would be his monthly benefit through April 30, 2001. Beginning on May 1, 2001, Jefferson stated it would be coordinating the benefit with Plaintiff's social security disability benefits, and Plaintiff would be eligible to receive a monthly benefit payment of $1,458.19 (*id.*). The letter did not expressly state the date when Plaintiff's disability originally began. Under this new "recurrent" finding, Jefferson was obligated to pay less, as per the above calculations. Indeed, had the claim been treated as a "new" period of disability, the benefit, net of Social Security, would have been $7,640 per month – an additional $6,000-plus per month that would total approximately $2.2 million more over the life of the claim.

III.     PROCEDURAL BACKGROUND

A.     Judge Figa's Ruling

As stated previously, Judge Figa issued a Final Order on Review of Administrative Record on April 27, 2005. *DeGrado v. Jefferson Pilot Financial*

*Insurance Co.*, 367 F. Supp. 2d 1315 (D. Colo. 2005). In that Order, Judge Figa found that the arbitrary and capricious standard of review applied and that a conflict of interest existed because Jefferson was both the plan administrator and the insurer. *Id.* at 1321. He applied the sliding scale approach to evaluating the conflict. *Id.* at 1321-22.

Judge Figa first found that Jefferson's calculation of benefits under the Policy for "recurrent" disability claims was unreasonable. *Id.* at 1324. Further, he stated that "[e]ven if the defendant's calculation of the Total Disability Monthly Benefit under the recurrent disability provisions were correct, or reasonable under *Fought*, the Court would find the defendant's determination unreasonable on a different ground." *Id.*

Specifically, Judge Figa found that Defendant's December 2001 decision to treat Plaintiff's recurrent disability as "part of the prior Disability" because it found that Plaintiff did not return to work in his regular occupation on a full-time basis for six months or more, "[was] unsupported by substantial evidence on the record." *Id.* at 1324. He noted that the decision did not indicate what evidence was relied on. Further, he found error with numerous findings in the decision based on the documents that were allegedly considered as stated in Hagemann's attached affidavit. *Id.*

Among other things, Judge Figa found error with Hagemann's conclusion that Sloans' payroll records (AR 945) were unreliable as an indicator of how much Plaintiff had worked. *Id.* at 1325. He concluded that the payroll records relating to Plaintiff's work hours during the period from November 13, 1999 through January 20, 2001 supported a conclusion that Plaintiff did work full-time for most of the year 2000, and also reflected the onset of his illness and inability to work full-time commencing in

November 2000. *Id.* In addition, he noted that Sloans' payroll ledger reflected gross pay paid to Plaintiff every two weeks (AR 947). *Id.* at 1326. Judge Figa found that it is legitimate to infer that an employer would not pay the full annual salary on a bi-weekly basis to an employee scheduled for, but who did not perform, full-time work. There is nothing in the record which suggests that Plaintiff was deceiving his employer about his work hours. *Id.* In addition, Judge Figa noted that Plaintiff provided an affidavit which supports that he worked full-time. *Id.*

Judge Figa also found it telling as to what the administrative record did not contain about this issue. *Id.* He found that "t[]here is no evidence that during its administrative review the defendant obtained or attempted to obtain a statement from plaintiff as to whether or not he was working full-time in 2000." *Id.* Similarly, there was not a request to Plaintiff's supervisor or employer to provide a statement regarding his work hours during the relevant period in 2000. *Id.* Judge Figa noted that a failure to obtain additional information from a claimant's employer could be the basis for a reversal of a claims determination. He further noted, "[r]ather than obtaining more information from the plaintiff, or from the plaintiff's employer or supervisors, here the claims administrator relied on fragments of documents found in her file that were submitted for entirely different purposes." *Id.* at 1327.

Judge Figa also found that a review of the twenty documents listed in Hagemann's affidavit show that twelve of them were dated before March 1, 2001. *Id.* Thus, they were apparently in Jefferson's files at the time it first denied Plaintiff's claim for a period of disability in 2000. *Id.* Yet, in its March 1, 2001 letter, Jefferson treated

that as a claim for a new period of disability under the first sub-paragraph of the recurrent disability definition as compared to a recurrent claim under the second sub-paragraph. *Id.* He noted that if the documents in Hagemann's affidavit were indeed supportive of her later determination that plaintiff did not meet the work criteria in sub-paragraph one, the March 2001 letter should have so reflected. But it did not, thus raising doubt as to why the documents were considered part of the "vast weight of the record evidence" only a few months later when Hagemann issued her December 13, 2001 determination." *Id.* Based on this, Judge Figa found that Jefferson "has not met its burden of demonstrating substantial evidence to support its determination that plaintiff 'returned to his regular occupation on a full-time basis for less than six months . . . .'" *Id.* (citing AR 999).

In addition, Judge Figa slid further along the "sliding scale of deference" when he took into account the apparent irregularity of Jefferson's undated calculation of comparative benefits under the two different sub-paragraphs of the recurrent disability provision. *Id.* (citing AR 1004-07). He recognized that Hagemann denied she directed the calculation to be performed or that she relied on it in any manner in making her decision of December 13, 2001. *Id.* Judge Figa stated that if he believed the contrary were true, he would be hard-pressed to find that Jefferson properly acted as a fiduciary as it is required to do under ERISA, for such conduct would plainly indicate that Jefferson put its own financial interest before that of the insured. *Id.* On the other hand, he noted that Jefferson offered no plausible explanation as to why the claims administrator would prepare such a document if it had already decided that Plaintiff's

claim would be treated as a recurrent claim under the second sub-paragraph and part of a prior disability.  Jefferson also did not provide dispositive evidence that the calculation was provided after determination of Plaintiff's claim.  *Id.*  He stated that while Jefferson's explanation of all this evidence as innocuous could be correct, it behooves a fiduciary to better document the reasons for such ostensibly questionable actions and notations.  *Id.* at 1328.

Judge Figa concluded, "[t]aking all the evidence as a whole, and reducing the deference in accordance with the guidance of *Fought*, this Court concludes that the determination that plaintiff's claim should be treated as a recurrent claim and part of the prior disability is not supported by substantial evidence on the record, and therefore that determination must be set aside as arbitrary and capricious."  *Id.*  Judge Figa ordered Jefferson to pay benefits based on Plaintiff's disability being treated as a "new period of disability" on an ongoing basis, and to calculate the past benefits due to Plaintiff (the difference between the claim being a new period of disability versus part of the prior disability under the "Recurrent" provision).  *Id.*

B.      The Tenth Circuit's Decision

Jefferson appealed.  The Tenth Circuit reviewed Judge Figa's Order on a *de novo* basis, limiting its review to the evidence in the administrative record.  *DeGrado*, 451 F.3d at 1169.  It generally agreed with Judge Figa's analysis of the standard of review and the conflict of interest in the case.  *Id.* at 1167-68.  Thus, it decided to "take a hard look at the evidence and arguments presented to the plan administrator to

ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest." *Id.* at 1168.

The Tenth Circuit first disagreed with Judge Figa's decision regarding Jefferson's calculation of the benefits for a recurrent claim, concluding that the calculation was reasonable. *Id.* at 1169. It then turned to Jefferson's determination that Plaintiff's disability was "recurrent" under the terms of the policy as compared to a "new" claim, limiting its review to the administrative record. *Id.*

The Tenth Circuit rejected Jefferson's argument that it reasonably interpreted the term "full time," as used in the Policy, to mean "40 hours or more per week." Instead, it stated that the Policy was meant to extend disability benefits to those Sloans employees who worked thirty hours or more per week. *Id.* Thus, the Tenth Circuit found that if Plaintiff "worked at least thirty hours per week for six months or more after returning from his first period of disability, then his second claim for disability would be considered 'new' under the terms of the Policy outlined above." *Id.* "In contrast, if DeGrado failed to work at least thirty hours per week for six months or more after returning from his first period of disability, then his second claim for disability would be considered 'recurrent.'" *Id.*

The Tenth Circuit ultimately concluded, as Judge Figa had done, that Jefferson "failed to demonstrate that its treatment of DeGrado's disability as 'recurrent' was supported by substantial evidence." *Id.* at 1174-75. It noted that Jefferson initially concluded, based upon the evidence available to it as of March 2001, that DeGrado had worked full-time for more than six months after his first period of disability, and that his

second claim for disability was therefore considered "new" rather than "recurrent." *Id.* at 1175.  Although Jefferson later obtained some additional evidence that was contrary to this conclusion, the Tenth Circuit found that the administrative record contained conflicting evidence with regard to DeGrado's working status.  *Id.*

The Tenth Circuit also noted three additional factors that were relevant to its decision.  It first noted that Hagemann's letter of December 13, 2001 (treating Plaintiff's claim as "recurrent" rather than "new") failed to explain precisely how she reached her conclusion that Plaintiff did not work full-time for at least six months following his first period of disability.  It stated:

> [m]ore specifically, there was no indication in that letter (or, for that matter, anywhere else in the administrative file) of precisely how many hours per week that Hagemann concluded DeGrado had worked during the time period in question. Instead, the letter suggests that Hagemann simply reached a general conclusion that DeGrado could not have, due to his physical symptoms, worked the number of hours reflected in his payroll records.

*Id.*

Second, the Tenth Circuit found that "the presence of Wharton's comparative benefits calculations certainly calls into question the objectiveness of Jefferson's decision to treat DeGrado's claim as 'recurrent' rather than 'new,' since treating DeGrado's claim as 'new' would have greatly increased Jefferson's financial exposure. *Id.*  Third, the Tenth Circuit noted that "DeGrado was not informed, prior to December 13, 2001, that Jefferson was reconsidering its determination that his claim was 'new'" rather than "'recurrent,'" and thus there was no opportunity or incentive for DeGrado to submit evidence to Jefferson outlining precisely the number of hours he worked each

week during the period in question." *Id.* It also noted that Hagemann made no attempt to interview Plaintiff regarding this issue before making her December 2001 determination. *Id.*

The Tenth Circuit thus concluded that Jefferson's decision was arbitrary and capricious, and turned to the proper remedy. *Id.* It reversed Judge Figa's decision to order Jefferson to pay benefits based on the disability being treated as a new period of disability. Instead, the proper remedy was stated as follows:

> In light of the evidence in the administrative record that we have already discussed, it is apparent that the evidence regarding DeGrado's work status during the time between his two periods of disability was conflicting. In other words, we cannot say that there is no evidence in the record to support Jefferson's decision, or that the evidence so clearly points the other way as to make a remand unnecessary. Rather, the flaw in Jefferson's decision is that it failed to make adequate factual findings regarding DeGrado's work status during the time period in question. Thus, the proper remedy is to remand the case to Jefferson so that it can make further findings on this issue (citation omitted). In doing so, Jefferson is directed to "tak[e] new evidence should [DeGrado] wish to submit the same." *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 32 (1st Cir. 2005).

*Id.* at 1176. The Tenth Circuit remanded the case to this Court "with directions to remand the case to Jefferson for further proceedings consistent with this opinion." *Id.*

C.      Post-Remand Proceedings

On September 1, 2006, Judge Figa remanded the case to Jefferson "for further proceedings consistent with the opinion of the Tenth Circuit." (Dkt. # 167). Through an Order filed October 26, 2007, Judge Figa noted that after remand, on October 18, 2006, Plaintiff submitted additional information to Jefferson consisting of five (5) sworn affidavits from his "physicians, acquaintances and business associates" who asserted to

have personal knowledge of Plaintiff "during the pertinent time period."  (Dkt. # 187 at

5.)  On January 19, 2007, Plaintiff submitted an affidavit from a Mr. John Tice, described

as a former co-employee of Plaintiff at Sloans.  *Id.*

During this time frame, Jefferson apparently conducted a further investigation

into Plaintiff's employment.  *Id.*  This investigation included contacting and obtaining

statements and affidavits from other employees, submitting the file to an "independent

physician for assessment," and seeking information from the successor disability insurer

for Sloans.  *Id.*  Thereafter, Jefferson through a January 31, 2007 letter (AR 2924-54)

notified Plaintiff that it had "determined that [he] did not return to work on a full time

basis for six months or more between the two periods of disability" (*id.* 2950).  Among

other things, Jefferson based its conclusion on an interpretation of the policy that

plaintiff "was expected to work at his regular occupation on a full-time basis of 40 hours

per week" *(id.* 2943).  Thus, Jefferson stood by its determination issued in December

2001 that Plaintiff's November 2000 disability was part of a prior disability, for which

benefits would be paid at a lower rate.

In addition, Jefferson advised Plaintiff that it had also now discerned that Sloans

terminated disability coverage with Jefferson on October 31, 2000, and so Plaintiff was

not covered under the disability on the "new Date of Disability" (*id.* at 2951).  Jefferson

advised Plaintiff that if his November 2000 claim had been a "new claim there would

have been no coverage for the claim" (*id.*).  But, since Jefferson had determined the

claim to be recurrent, dating back to his prior disability, he continued to be covered

under the policy's recurrent provision, albeit at the lower benefits rate (id.)

In March 2007, Plaintiff filed a Motion for Declaration of Procedure and Scope of Remand with Judge Figa (Dkt. # 178).  Plaintiff's motion asserted that the issuance of the January 2007 letter from Jefferson, and the conduct of Jefferson leading up to the issuance of the letter, were undertaken in "complete disregard" of the Tenth Circuit's decision and the Order of Remand.  Essentially, Plaintiff contended that Jefferson failed to limit its inquiry and decision to the issue remanded, made findings based on information other than that submitted by Plaintiff, and failed to honor the law of the case. Plaintiff requested that the Court strike Jefferson's 29-page denial letter and issue a declaration of the proper scope of Jefferson's review on remand (*id.* at 20-21.)

By Order of October 26, 2007, Judge Figa granted Plaintiff's motion in part, finding that Jefferson's January 2007 determination letter, and the procedures undertaken in reaching that determination, exceeded the scope of the remand and conflicted with binding determinations made by him and the Tenth Circuit (Dkt. # 187 at 9-14 ).  He found that the Tenth Circuit did not order or contemplate a new investigation by Jefferson, nor did it direct the obtaining of additional information other than that which Plaintiff wished to provide (*id.* at 9-10).  The only issue on which Jefferson was given leave to make new findings was as to Plaintiff's "work status" (*id.*)  The task on remand was for Jefferson to make a determination, based on the administrative record existing at the time of the December 2001 decision plus whatever additional evidence Plaintiff might submit, as to whether or not Plaintiff returned to work after his first period of disability for at least 30 hours per week for six months or more, and make written

findings that support whatever determination is reached (*id*. at 10).  Judge Figa found

that since Jefferson failed to meet this task, the case must again be remanded (*id*.).

Also, in order to avoid further motions regarding the scope of the remand Judge

Figa gave certain directions that must be followed in connection with the remand.

Jefferson's "after the fact justification for reading 'full time' to mean 40 hours per week in

plaintiff's situation" was rejected (*id*. at 12).  On remand, Jefferson was directed to make

its determination interpreting the phrase "full-time basis" to mean 30 hours per week or

more as the Tenth Circuit required (*id*.)  The Order declined to comment on the

interpretation stated in the January 2007 letter that the "six month" period in the policy

means six "consecutive" months (*id*. at 13).  However, since certain deposition

testimony of Hagemann was submitted by Plaintiff as part of the new evidence to be

considered by Jefferson on remand, it was ordered that the testimony had to be

considered on that issue (*id*. at 13-14).  However, the affidavit submitted by Hagemann

in 2007 was not to be considered (*id*. at 14).  Finally, the Order ruled that in making its

determination Jefferson may not now take the position that the disability policy was

terminated as of October 31, 2000 since it did not take that position or give Plaintiff

notice of the purported termination at any time prior to its December 2001 determination

(*id*. at 14).

The October 2007 Order concluded by directing Jefferson on remand to: 1) make

a new determination, based solely on the administrative record that existed at the time

of its December 2001 decision, plus the new evidence submitted by Plaintiff prior to

January 31, 2007, as to whether or not Plaintiff returned to work after his first period of

disability for at least 30 hours per week for six months or more; 2) make written findings that support whatever determination is reached; and 3) issue the new determination within 40 days of the date of the Order (*id*.).  Jefferson was later granted an extension to December 11, 2007, to submit its Redetermination of Claim.

IV.     THE REDETERMINATION OF THE CLAIM

        In the redetermination of claim letter dated December 11, 2007 (again authored by Daly), which was corrected on December 17, 2007, Jefferson first stated that it withdrew its January 31, 2007 letter "under protest, and subject to Jefferson's potential eventual appeal of the Scope of Remand Order."  (December 11, 2007 Letter, Ex. 13 to Pl.'s Mot. for Summ. J., at 1.)  The letter further states that pursuant to the Scope of Remand Order, Jefferson addresses "only the issue of whether Mr. DeGrado worked full-time for at least six months between September 20, 1999 and November 28, 2000, which is the period that he returned to work between his two periods of disability" (*id*.)

        The letter begins by summarizing the Claim Decision Making Process and the basis of the March 1, 2001 original decision letter on Plaintiff's claim (Ex. 13 at 3, ¶ 1). Through this, Jefferson attempts to show that its March 2001 decision which found that Plaintiff's second claim was "new" did not conflict with its December 2001 decision finding the claim to be "recurrent".  Further, the letter says that the issue of Plaintiff's work schedule was important only in determining his date of disability ["DOD"]—once it was determined that Plaintiff was not disabled as of his DOD, the claim review process ended (unlike the later December 2001 decision which relied on further information

-22-

since the claim review process went through all the relevant stages and found Plaintiff disabled).  (*Id.* at 2-4.)

The letter then provides a lengthy recitation of all the evidence considered (including the evidence submitted by Plaintiff post-remand) and what that evidence is relied on for (*id.* at 5-14).  62 specific pieces of evidence are identified, which include medical records, records of communications with Sloans, records of communications with Plaintiff, affidavits submitted by Plaintiff, Plaintiff's admissions, his social security application, and other evidence.

The letter also discusses the Recurrent Disability Provision, and states that Jefferson interpreted this provision "to mean a return to work six months, measured consecutively" (*id.* at 14-15.)  The letter rejected Plaintiff's argument that the policy requires only that an employee return to work full time for a sufficient number of days that would constitute six months, even if the days are not consecutive.  *Id.*  Instead, Daly states that in her 15 years experience, Jefferson has always interpreted the policy consistent with her interpretation, and that Jefferson's LTD trainer confirmed that this is the correct interpretation.  *Id.*  The letter also says that "the six months of full-time employment must be uninterrupted by periods of absence from work due to the prior disability."  *Id.*

In interpreting the policy this way, Daly rejects the deposition testimony of Hagemann, Jefferson's Rule 30(b)(6) representative, who testified consistent with Plaintiff's interpretation that the six months must not be consecutive (*id.*).  Daly states in the letter that she found the deposition excerpt of Hagemann submitted by Plaintiff to be

difficult to fully understand, as it was only a small portion of a much longer transcript (*id.*).  Further, she says that it appears Hagemann confused the six months in the Recurrent Disability Provision with the Elimination Period, in which an insured must work for a total of 90 days within a six-month period before h/she is eligible to receive benefit payments (*id.*).

Daly also finds that Plaintiff's suggested approach is contrary to the purposes of the Recurrent Disability Provision, which is to relieve a disabled employee from having to satisfy a new elimination period if s/he attempts unsuccessfully to return to work (*id.* at 16).  Under Plaintiff's approach, an employee would be accumulating full-time days which would end up counting against the employee at some point (*id.*).  Further, Daly states that Plaintiff's approach is inconsistent with the common sense meaning of the provision, and that it would require a level of administration that would be nearly impossible (*id.*).  On the other hand, Daly states that "applying the Recurrent Disability Provision to require a six-month consecutive period is straightforward, administratively manageable, and works to the advantage of disabled employees who attempt to return to work" (*id.* at 16-17).

Daly next considers whether Plaintiff returned to work full-time for six consecutive months between his first and second periods of disability (*id.* at 17).  She  finds that the payroll records are not credible (*id.* at 17-20).  Among other reasons for this finding, Daly states that the payroll records for November 1999, showing Plaintiff was paid full-time, were contradicted by Plaintiff's own statements that he was working part-time then (*id.* at 20).  She also notes that statements by Plaintiff and Rob Falkenberg

["Falkenberg"] (a former supervisor of Plaintiff) that Plaintiff was too sick to work, had frequent absences, irregular hours and struggled to maintain his employment, as well the medical records, further contradict the payroll records. Those records show that Plaintiff only took three sick days over the 12 month period from November 1999 to November 2000, despite how obviously incapacitating his symptoms had become (*id.*) Further, the letter notes that the payroll records do not reflect that Plaintiff took time off from work during periods that he and his doctors were reporting that Plaintiff had to take time off or Plaintiff's statements to social security that he could only work part-time (*id.*).

Daly concludes in her letter that the payroll records reflect only that Plaintiff was paid—not that he worked—full time during the period between his two disability payments (*id.* at 20). She finds that this is consistent with what Sloans did the first time Plaintiff went out on disability in 1999—they continued to pay him while he was on disability leave (*id.*). Thus, the payroll records are not an accurate account of how much Plaintiff worked over the relevant time period (*id.*).

Daly also finds Plaintiff's current statements that he returned to work full-time in December 1999 and that his condition deteriorated throughout 2000 until he had to stop working in November 2000 are not consistent with the medical records, which show that Plaintiff was improving from September to November 2000 (*id.*) Further, the medical records document that Plaintiff's physical symptoms were debilitating until July or August 2000 when they gradually began to improve (*id.* at 21-22).

Instead, Daly finds credible Plaintiff's statements of February and March 2001 to Jefferson's representative Brenehy that he had been working 10-15 hours a week since

January 2000 due to his medical condition, and that he was paid as a full-time employee even though he was not working full-time (*id.* at 21).  She states these statements were documented several times in the record, occurred less than three (3) months after he stopped working at Sloans (closer to the actual events in question) and Plaintiff did not dispute that these statements were made when Brenehy repeated the statements back to him or in response to the letter he received on March 1, 2001 (*id.*). Further, she found that Falkenberg's statements confirm Plaintiff's statements, as well as the medical records (*id.*).  Thus, Daly concludes that the evidence does not demonstrate that Plaintiff returned to work on a full-time basis for six months between his two periods of disability (*id.* at 24).

V.    THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

The parties have now filed cross Motions for Summary Judgment as to the reasonableness of Jefferson's redetermination decision and whether the decision should be affirmed or reversed.  Plaintiff filed his Post-Remand Motion for Summary Judgment and Supporting Memorandum on March 28, 2008.  A response was filed June 9, 2008, and a reply was filed July 28, 2008.  Jefferson filed its Post-Remand Motion for Summary Judgment and Brief on August 18, 2008.  A response was filed September 16, 2008, and a reply was filed October 11, 2008.  The Administrative Record was originally submitted on April 23, 2004.  An updated Administrative Record was filed June 9, 2008.

Plaintiff argues that the Court is presented with a narrow issue:  whether Jefferson's second redetermination decision, declining to treat Plaintiff's claim for

disability benefits as "new" under the Plan's recurrent disability provision, was arbitrary and capricious. Specifically, it is argued that Jefferson's December 2001 decision has been judicially determined twice to be arbitrary, capricious, and unsupported by substantial evidence. The claim has now been augmented by substantial additional evidence, including sworn affidavit testimony, in support of Plaintiff's claim that he worked on a full-time basis (*i.e.,* at least 30 hours per week) for more than six months during the 14-month period from September 20, 1999 through November 28, 2000. Jefferson arbitrarily insists that none of the materials submitted by Plaintiff after remand constitute evidence to which it should give any weight. Further, Plaintiff asserts that the dearth of support for Jefferson's conclusions is palpable.

Plaintiff concludes that Jefferson's latest redetermination letter demonstrates unequivocally that its decision making on remand remains true to its historical pattern of arbitrary, capricious, and unreasonable behavior, tainted by self-interest. The Court should reject Jefferson's conclusions as such, find that the evidence in the record fully supports a determination that DeGrado returned to work on a full-time basis for at least six months during the interim period, and reinstate DeGrado's benefits based upon his higher income earned during the period he was able to return to work. Plaintiff also requests an award of his attorneys fees and costs for pursuit of this claim from inception through the present.

Jefferson agrees that the dispute in this case is whether it reasonably determined that Plaintiff did not return to work on a full-time basis for six months between his first and second periods of disability. It asserts that the determination that Plaintiff did not

return to work full-time for at least six months is supported by substantial evidence. From the very beginning of his second claim, Plaintiff made clear that he had been severely impaired in his ability to work since returning to Sloans in September 1999. In telephone calls with Jefferson representatives, Plaintiff repeatedly stated this himself and stated that he only worked part-time, *i.e.*, 10-15 hours a week, as a result. Further, Plaintiff's own Complaint states that he only worked part time and Jefferson asserts that this is a judicial admission on the issue. Jefferson also relies on other evidence in the record, including the medical records, as support for its argument that Plaintiff's statements as to working part time are more credible than the payroll records, which Jefferson assigns no weight to.

Jefferson concludes that the record evidence overwhelmingly supports Plaintiff's initial position in the case—that he stopped working full-time in January 2000. Plaintiff has focused this litigation <u>not</u> on the facts in the claim file, but on impugning the "motives" underlying Jefferson's appeal decision. Jefferson contends that it has properly relied on the claim file, rather than on conjecture and inference, to demonstrate that its decision regarding the application of the "Recurrent" provision was reasonable and supported by substantial evidence. Accordingly, Jefferson asserts that its decision should be affirmed by this Court.

VI.   <u>ANALYSIS</u>

A.   <u>Summary Judgment Standard</u>

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "When applying this standard, [the court must] 'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'"  *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted).

"When the parties file cross motions for summary judgment, '[the court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts.'"  *Id.* (quotation omitted).  Cross motions for summary judgment must be treated separately—the denial of one does not require the grant of another.  *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

In an ERISA case, the First Circuit has held that the review to be utilized differs in one important aspect from the review in an ordinary summary judgment case.  *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir.), *cert. denied*, 546 U.S. 937 (2005).  "[W]here review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue."  *Id.*  "When there is no dispute over plan interpretation, the use of summary judgment in this way is proper regardless of whether [the] review of the ERISA decision maker's decision is de novo or deferential."  *Id.*

B.    Standard of Review of Jefferson's Decision

"A denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). There is no dispute in this case that the disability policy gives discretion to the administrator to determine eligibility for benefits and construe the terms of the Plan. Therefore, I must apply the "arbitrary and capricious" standard of review. *See DeGrado,* 451 F.3d at 1167-1168.

Review under the arbitrary and capricious standard is limited to determining whether the administrator's interpretation of the plan was reasonable and made in good faith. *Weber v. GE Group Life Assur. Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008); *see also Rademacher v. Colo. Assoc. of Soil Conservation Dist. Med. Benefit Plan*, 11 F.3d 1567, 1569 (10th Cir. 1993) (under the arbitrary and capricious standard, the court looks to whether the decision is "lacking in substantial evidence or contrary to law"). "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker.'" *Caldwell v. Life Ins. Co. of N. America*, 287 F.3d 1276, 1282 (10th Cir. 2002) (quotation omitted). "In determining whether the evidence in support of the administrator's decision is substantial, [the court] must 'take[] into account whatever in the record fairly detracts from its weight.'" *Id.* (quotation omitted).

Under this standard, the administrator's decision may not be set aside if it is based on a reasonable interpretation of the plan's terms and made in good faith.

*Weber*, 541 F.3d at 1010. "'The Administrator's decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within his knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded on any reasonable basis.'" *Finley v. Hewlett-Packard Co. v. Employee Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1176 (10th Cir. 2004) (quotation omitted). Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary. *Id.*; *see also Sandoval v. Aetna Life and Cas. Ins. Co.*, 967 F.2d 377, 380 & n. 4 (10th Cir. 1992).

It is also undisputed in this case that Jefferson has an inherent conflict of interest. *See DeGrado*, 451 F.3d at 1167. Since Jefferson "is both the insurer and plan administrator, Jefferson 'may favor, consciously or unconsciously, its interests over the interests of the plan beneficiaries.'" *Id.* (quoting *Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1003 (10th Cir.2004) (internal quotation marks omitted)). Accordingly, this conflict must be factored into the analysis. *Firestone*, 489 U.S. at 115 ("if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion'") (quotation omitted).

The Supreme Court recently clarified how a court must evaluate a conflict in *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (June 19, 2008). It confirmed that where the administrator is a professional insurance company, a conflict exists. *Id.* at 2349. *Glenn* then turned to "the question of 'how' a conflict should 'be taken into

account on judicial review of a discretionary benefit determination.'"  *Id.* at 2350

(quotation omitted).  It held that the requirement that a conflict should be weighed as a

factor in deciding whether there is an abuse of discretion "does not imply a change in

the standard of review from deferential to *de novo* review."  *Id.*  Further, *Glenn* did not

believe it was "necessary or desirable for courts to create special burden-of-proof rules,

or other special procedural or evidentiary rules. . ." in evaluating a conflict.  *Id.* at 2351.

Instead, it held that "*Firestone* means what the word 'factor' implies, namely, that when

judges review the lawfulness of benefit denials, they will often take account of several

different considerations of which a conflict of interest is one."  *Id.*

> *Glenn* further held:
>
> In such instances, any one factor will act as a tiebreaker when the other
> factors are closely balanced, the degree of closeness necessary depending
> upon the tiebreaking factor's inherent or case-specific importance. The
> conflict of interest at issue here, for example, should prove more important
> (perhaps of great importance) where circumstances suggest a higher
> likelihood that it affected the benefits decision, including, but not limited to,
> cases where an insurance company administrator has a history of biased
> claims administration. It should prove less important (perhaps to the
> vanishing point) where the administrator has taken active steps to reduce
> potential bias and to promote accuracy, for example, by walling off claims
> administrators from those interested in firm finances, or by imposing
> management checks that penalize inaccurate decisionmaking irrespective of
> whom the inaccuracy benefits.

*Id.*

The Tenth Circuit discussed *Glenn* in a recent decision and held that the court

must "dial back" the deference given to the administrator if it is operating under a

conflict of interest.  *Weber*, 541 F.3d at 1010.  *Weber* held that the Tenth Circuit's

sliding scale approach to a conflict " mirrors the *Glenn* Court's method of accounting for

the conflict-of-interest factor." *Id.* at 1010-1011. The sliding scale approach calls for the Court to decrease "the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict." *See DeGrado*, 451 F.3d at 1167-1168. Thus, I must decrease the level of deference given in proportion to the seriousness of the conflict. *Weber*, 541 F.3d at 1010; *see also Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 826 (10th Cir. 1996) ("'the fiduciary decision will be entitled to some deference, but his deference will be lessened to the extent necessary to neutralize any untoward influence resulting from the conflict'") (quotation omitted).

C.  Whether Jefferson is Improperly Arguing Issues Which Were Decided by the Tenth Circuit and Are Barred From Reconsideration

In deciding whether Jefferson's decision that the claim was recurrent was arbitrary and capricious, I first address the scope of the mandate from the Tenth Circuit and whether Jefferson is improperly attempting to obtain a redetermination of issues that were decided by that court. I agree with Plaintiff that Jefferson appears to be seeking a redetermination of certain issues that were decided by the Tenth Circuit and are barred from reconsideration.

The mandate rule "'provides that a district court must comply strictly with the mandate rendered by the reviewing court.'" *Huffman v. Saul Holdings Ltd. Partnership*, 262 F.3d 1128, 1132 (10th Cir. 2001) (quotation omitted). The scope of the mandate derives from the scope of the remand—when the mandate specifies what proceedings are to take place on remand, "'the district court is limited to holding such as are directed.'" *Hicks v. Gates Rubber Co.*, 928 F.2d 966, 971 (10th Cir. 1991) (quotation

omitted).  Under the mandate rule, courts generally may not consider issues decided on a previous appeal.  *United States on Behalf of Dep't of Labor v. INA*, 131 F.3d 1037, 1041 (D.C. Cir. 1997).  This rule is an important corollary to the law of the case doctrine.

In this case, the scope of the mandate was limited.  The Tenth Circuit found, among other things, that Jefferson failed to demonstrate that its treatment of DeGrado's disability as "recurrent" was supported by substantial evidence.  *DeGrado,* 451 F.3d at 1174-75.  It noted that the evidence regarding DeGrado's work status was conflicting, and that Jefferson failed to make adequate factual findings regarding DeGrado's work status during the time period in question.  *Id.* at 1175.  The case was remanded "to Jefferson so that it can make further findings on this issue."  *Id.*  In doing so, Jefferson was directed to "tak[e] new evidence should [DeGrado] wish to submit the same."  *Id.* Judge Figa found (and I agree) that this precluded Jefferson from relying on new evidence on the issue, other than that submitted by Plaintiff.

Jefferson now argues that it never found in its March/April 2001 letters that the claim was a "new" claim, and that it did not evaluate that issue in those determinations. Jefferson bases that argument on its policies and procedures for evaluating a claim which are discussed at length in its briefs.  I find that this issue was decided by the Tenth Circuit, and the scope of the remand did not include reevaluation of this issue by Jefferson.  Specifically, the Tenth Circuit found that the March 1, 2001 letter "concluded that DeGrado's claim was one for a new period of disability beginning on November 28, 2000."  *DeGrado*, 451 F.3d at 1164.  It found that Jefferson concluded based upon the evidence available to it as of March 2001 that DeGrado had worked full-time for more

than six months after his first period of disability, and that his second claim for disability was therefore considered "new" rather than "recurrent." *Id.* at 1175. Indeed, the April 9, 2001 letter reaffirming the March 1, 2001 decision specifically addressed the issue, finding the claim was "a new, separate claim" and was not a continuation of his previous claim. *Id.* at 1164. Thus, I find that Jefferson is bound by the Tenth Circuit's determination on this issue, and cannot now argue that it did not actually treat the claim as a new claim in the letters of March and April, 2001. Further, even if not barred by the mandate rule, I find the Tenth Circuit's interpretation of the issue is reasonable based on the administrative record.

Further, I agree with Plaintiff that Jefferson's rationalization of its behavior through new evidence about its claim procedures is not appropriate since this is an entirely new argument not previously advanced in the case. *See Flinders v. Workforce Stabilization Plan of Phillips*, 491 F.3d 1180, 1190-91 (10th Cir. 2007) (to determine whether a plan administrator considered and asserted a particular rationale, we look only to those rationales that were specifically articulated in the administrative record as the basis for denying a claim. . . .'[w]e will not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sandbagged by after–the-fact plan interpretations devised for purposes of litigation'") (quotation omitted).[8]

---

[8] Even if this evidence were to be considered, it suggests a procedural irregularity. Specifically, Jefferson asserts that in March and April of 2001 it did not actually consider whether the claim was "new" and only considered the late 2000 medical records. Since the records indicated that DeGrado had improved, the claim was denied for insufficient showing of disability, without any determination of whether the claim was new. If this correct, I note that Jefferson may have acted unreasonably in that time frame since it did not review the entire file, and may also have violated its claims handling procedures.

The Tenth Circuit also found that "the information on the report [of the cost comparison found in Jefferson's file] suggests it was prepared at some point prior to October 3, 2001", since it listed Degrado's birthdate as 10/3/1965 and his age as "35", "clearly suggesting the report was produced prior to October 3, 2001, when DeGrado would have turned 36 years of age." *Id.* at 1165; *see also* AR 1004-1007. While Jefferson contests this in its redetermination letter and briefing, I believe this finding is also precluded by the mandate rule. Clearly the scope of the remand did not include reevaluation of this issue by Jefferson. Further, even if not barred by the mandate rule, I find the Tenth Circuit's interpretation of the issue is reasonable.

Also, I find that evidence presented by Jefferson that "full-time" means 40 hours per week, not 30, is barred by the mandate rule. This is consistent with Judge Figa's ruling in his Order regarding the scope of remand.

Plaintiff also argues that Jefferson improperly relied on new evidence, in contravention of the Tenth Circuit's Order, in attempting to refute Hagemann's deposition testimony. Specifically, Daly states in her redetermination letter that she checked with her trainer and others as to whether her interpretation of the six month period was valid and was told that it was. I agree with Plaintiff that this new evidence may have been properly considered by Daly as Jefferson was limited to the evidence in the record and any evidence that Plaintiff submitted. In an abundance of caution I have, however, considered this evidence and note that it does not impact my decision in any way

Finally, Plaintiff argues that the Tenth Circuit found the payroll records credible and that Jefferson's attempt in its redetermination letter to discredit the payroll records is improper. The Tenth Circuit held as follows with respect to the payroll records:

> Those records unequivocally indicated not only that DeGrado was paid for full-time work during the period in question, but that he actually worked more than thirty hours per week for more than six months. More specifically, the records indicated that, between January 8 and November 24, 2000, DeGrado worked between seventy-two and eighty hours each two-week pay period, with the exception of two pay periods when he worked sixty-six and sixty-four hours (the sixty-six hour pay period occurred in July 2000, and the sixty-four hour pay-period occurred in October 2000). App. at 1650. As noted by the district court, these payroll records clearly "support[ ] a conclusion that [DeGrado] did work full-time for most of the year 2000, and also reflect[ ] the onset of his illness and inability to work full-time commencing in November 2000." *Id.* at 3426-27.

*DeGrado*, 451 F.3d at 1171.

As noted earlier, the Tenth Circuit also found that there was conflicting evidence regarding DeGrado's work status in the record, and remanded the case to Jefferson to make adequate factual findings on this issue. I find from this that the Tenth Circuit contemplated that Jefferson would reevaluate all the evidence on the issue of Plaintiff's work status during the relevant time period, including the payroll records, and make factual findings on the issue. A separate question is whether Jefferson should have given any deference to the Tenth Circuit's findings. That issue will be evaluated in connection with my determination of the merits of this appeal.

D.     Whether Jefferson's Decision that the Six Month Period Must be "Consecutive" was Arbitrary and Capricious

Before turning to the ultimate issue in this case, whether the finding that Plaintiff did not work for six months or more between his first and second periods of disability

was reasonable, I address the more limited issue of the reasonableness of Jefferson's interpretation of the six month term.  Plaintiff contends that Jefferson's interpretation of the six month term as applied to his claim was arbitrary and capricious.  Jefferson contends on the other hand that its interpretation was reasonable.

I note that Jefferson stated two interpretations of the "six month" period in its redetermination letter.  The first interpretation is that Plaintiff must have worked full-time for six consecutive months during the relevant time period.  The second interpretation is that "the six months of full-time employment must be uninterrupted by period of absence from work due to the prior disability."  (Ex. 13 to Pl.'s Mot. for Summ. J. at 15.)  While Jefferson appeared to believe that these interpretations were essentially the same, *i.e.*, that they had the same impact on the work requirements for the six month period, I do not necessarily read them that way.

I first note that it is highly unusual for Jefferson to have interpreted the "six month" period of employment in this manner for the very first time in its redetermination letter post-remand.  While I find that Jefferson is not precluded from making its interpretations, I do believe that it suggests some procedural irregularity on the part of Jefferson that must be taken into account in my determination.  *See Flinders*, 491 F.3d at 1191.

I now turn to the interpretation of the "six month" period to mean that an employee must work full-time for six consecutive months.  "A decision denying benefits based on an interpretation of an ERISA provision survives arbitrary and capricious review so long as the interpretation is reasonable."  *Id.* at 1193.  "Consequently, if a plan

-38-

provision is ambiguous, and the plan administrator adopts one of two or more reasonable interpretations, then the plan administrator's decision to deny benefits based on that interpretation survives arbitrary and capricious review." *Id*. "To the contrary, if the plan provision is unambiguous, and the plan administrator's interpretation differs from the unambiguous meaning, then the plan administrator's interpretation is unreasonable, and the decision to deny benefits based on that interpretation is arbitrary and capricious." *Id*. Thus, the starting point is to determine whether the plan provision is ambiguous. *Id*. If the provision is not ambiguous, then the court must construe it as a matter of law. *Id*. at 1193-94.

In the case at hand, the Recurrent provision provides that an employee who "returns to his [] regular occupation on a full-time basis for six months or more" begins a new period of Disability. Plaintiff cites case law that it contends supports his argument that the reference to "six months" should not be deemed to be consecutive. Jefferson asserts that it has interpreted "six months" consistent with its common meaning—that full time work is required for six consecutive calendar months. Jefferson further argues that Plaintiff advocates an interpretation of the Recurrent provision under which "six months" does not actually mean six months, it means some unquantified, open-ended time period over which a claimant may eventually work enough "full-time" days to finally accumulate six months of full-time work.

The first question is whether the Recurrent provision is ambiguous. A provision of a contract is ambiguous if it is susceptible to more than one reasonable interpretation. *Flinders*, 491 F.3d at 1193. The provision must be given "'its common and ordinary

meaning as a reasonable person *in the position of the plan participant* would have understood the words to mean.'" *Id.* at 1194 (emphasis in original) (quotation omitted).

I do not believe that the Recurrent provision as drafted is ambiguous in connection with the interpretation that the six months of full-time work must be consecutive. Courts interpreting the term "month" have found that it is not ambiguous, and that it signifies a calendar month, "regardless of the number of days it contains", unless an intention to the contrary is expressed. *McMillan v. Prudential Ins. Co.*, 365 N.E.2d 173, 174 (Ill. App. 1977) ("[i]t is universally held in the United States that the word "month" means a calendar month unless a contrary intent is indicated"); *Kennedy v. Pilot Life Ins. Co.*, 165 S.E.2d 676, 678 (N.C. App. 1969). Further, I believe that the ordinary and common meaning of a six month period in an employment context generally means six consecutive months. For example, if an employee is employed for a six month period, that would mean a consecutive six month period. If the term is not ambiguous and means that an employee must work full-time for six consecutive calendar months, then Jefferson's interpretation is consistent with the unambiguous meaning and is thus reasonable.

Further, even if the term is ambiguous, I find that Jefferson's interpretation of the term to mean full-time work for six consecutive months was reasonable. "If the language is ambiguous, then [the court] 'must take a hard look and determine' whether [the administrator's] decision was arbitrary in light of its conflict of interest." *Weber*, 541 F.3d at 1011 (quoting *Fought*, 379 F.3d at 1008). Courts interpreting Recurrent

Disability provisions like this one support Jefferson's interpretation.  *See Dandurand v.*

*36UNUM Life Ins. Co. of America*, 284 F.3d 331, 336 (1st Cir. 2002) (insured had a

recurrent disability as he returned to work for less than six months as compared to a

new disability when he never resumed his full-time duties and worked on a reduced

schedule).  Indeed, in *Dandurand,* the First Circuit found that the insurer's interpretation

of the policy that the subsequent claim of an individual who returned to work for more

than six months on a part time basis was a new claim (as compared to a recurrent

claim) to be unreasonable.  284 F.3d at 338.[9]

I also find that Jefferson's interpretation of the six month period to mean full-time

work for six consecutive months is reasonable because it is consistent with the

purposes of the Plan.  As explained by Jefferson, the Recurrent provision is designed to

protect employees from unsuccessful attempts to return to work full-time after a

disability.  Under Jefferson's interpretation, employees who try but cannot return on a

full-time basis for six consecutive months will begin receiving benefits as soon as they

go back out on disability, and the benefit payments will be the same as they were during

the first period of disability.  If a returning employee is unable to work full-time, and

consequently does not get paid for full-time work, his return-to-work earnings will be

lower than the full-time earnings he was being paid before he went out on disability the

---

[9]  Plaintiff cites a state case interpreting Arkansas law, *Insurance Co. of N. America v. Lemon*,
477 S.W.2d 187, 190 (Ark. 1972) to supports its argument that the six months does not need to be
consecutive.  *Lemon* held that a three month service requirement for the policy to be effective did not
require three months consecutive service.  However, this was based on the fact that the court construed
the policy "most strongly against the insurer."  *Id.*  Jefferson is correct that the Tenth Circuit has rejected
the rule of "*contra proferentem*,", which construes all ambiguities against the drafter, where the plan
administrator retains discretion and where the court is reviewing only whether the administrator abused
discretion (as here).  *Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1253 (10th Cir. 2007).

first time, and any benefit payments calculated on his return-to-work earnings will be lower than the benefit payments he was receiving during his first disability, before he attempted to return to work. Thus, the "Recurrent" provision is intended to prevent disabled employees, who try to return to work, from being economically penalized if their return to work proves unsuccessful.

Jefferson also argues that if the Recurrent provision was intended to mean "six months worth of full-time days" which can be accumulated over an open-ended time period—potentially spanning years—it would have been drafted to accommodate jobs which allow an employee to work when he can, with little predictability or consistency, as well as days when the employee does not show up at all. The employer and insurer resources required to track such an inconsistent and unpredictable schedule, in order to identify when an employee has accumulated "six-months worth of full-time days", would be unfeasible. Further, there are few jobs that would accommodate such a schedule. Finally, it is implausible to suggest that the Recurrent provision was intentionally drafted to accommodate work situations that rarely, if ever, exist.

From the foregoing, Jefferson has explained (and Plaintiff has not disputed) that its interpretation protects the vast number of insureds who attempt to go back to work full-time but are unable to do so. The fact that Plaintiff's situation turned out to be different (resulting in him being penalized) does not mean that the plan should have been interpreted in his favor while penalizing the vast majority of the insureds. Thus, I conclude that Jefferson has stated reasonable grounds for its first interpretation of the six month period.

Plaintiff argues, however, that this interpretation of the six month period is unreasonable and thus arbitrary and capricious because it is contrary to Jefferson's own Rule 30(b)(6) representative's testimony. On this issue, I first find that Jefferson is not bound by Hagemann's testimony. As noted by several courts, the binding effect of the testimony of a Rule 30(b)(6) representative is merely as an evidentiary admission, which may be controverted or explained by a party. It is not a judicial admission, which is conclusive and cannot be withdrawn without leave of court. *See Keller v. United States*, 58 F.3d 1194, 1198 n. 8 (7th Cir. 1995); *Media Servs. Group v. Lesso, Inc.*, 45 F. Supp. 2d 1237, 1254 (D. Kan. 1999); *Federated Mutual v. Botkin Grain Co.*, No. CIV. A 91-1223-MLB, 1997 WL 158399, at *4 (D. Kan. 1997); *W.R. Grace & Co. v. Viskase Corp.*, No. 90 C 5383, 1991 WL 211647, at *2 (N.D. Ill. 1991). Thus, a party such as Jefferson may generally present evidence explaining or contradicting Hagemann's testimony.[10] I further find that even taking into consideration Ms. Hagemann's testimony, Jefferson's other reasons for finding that the six month period requires six consecutive months of full-time work are reasonable, for the reasons stated above.

However, I find the second interpretation advanced by Jefferson to be unreasonable. Specifically, in addition to stating that the six month term requires six consecutive months of full-time work, Jefferson also stated in its redetermination letter

---

[10] While Plaintiff cites cases holding that a 30(b)(6) deponent cannot submit an affidavit that contradicts his/her testimony, that is not the situation here. Instead, Jefferson has submitted evidence from other representatives of the company that state that Hagemann's testimony in her deposition is not consistent with company policy. A separate question is whether this evidence was properly considered by Jefferson in the posture of this case, when Jefferson's review was limited to the administrative record and evidence that Plaintiff submitted. As indicated earlier, I am not sure that this evidence was properly relied on by Jefferson. While I have considered this evidence in an abundance of caution, it does not impact my ultimate findings.

that the "the six months of full-time employment must be uninterrupted by periods of absence from work due to the prior disability." (Ex. 13 to Pl.'s Mot. for Summ. J., at 15 ¶ 3). As Plaintiff notes, this could be construed to mean that Jefferson interpreted the policy to mean that when an employee such as Plaintiff takes a sick day or some short-term sick leave, that would terminate the consecutive six month period and the employee would required to begin a whole new six month period in order to recover benefits. I find that to be an unreasonable interpretation.

The Tenth Circuit was faced with an issue of plan interpretation very similar to this in the *Weber* case. There, Mrs. Weber purchased a Basic Life Insurance Benefits policy and Voluntary Life Insurance coverage in excess of the amount provided as a standard employee benefit, naming her husband as beneficiary. *Weber*, 541 F.3d at 1004. She listed her date of employment as September 23, 2002. *Id.* Mrs. Weber passed away on September 9, 2003. *Id.* at 1005. A "Notice of Claim Proof of Death" form signed by the employer noted that May 16, 2003 was Mrs. Weber's "Date Last Worked on a Full-Time Basis". *Id.* The effective date of the Voluntary Life Insurance coverage was May 1, 2003. *Id.*

Because the effective date of the insurance preceded her last day of work by only 15 days, the plan administrator conducted an investigation. *Id.* at 1006. The employer provided a payroll register for Mrs. Weber from January 1, 2003, to May 31, 2003. *Id.* Also attached was a series of e-mails from Mrs. Weber to the employer that listed Mrs. Weber's hours worked. *Id.* In an e-mail entitled "Hours worked May 1-15,"

Mrs. Weber states that she worked 5 hours on Monday May 12; 4 hours on May 13; 5 hours on May 14; and 5 hours on May 15.  *Id.*

GE denied Mr. Weber's claim.  It did so on the basis that Mrs. Weber was never eligible for the Voluntary Life Insurance coverage because she was not a "full-time employee, Actively At Work as defined by the policy at the employer's usual place of business, performing all the duties of her job on a full-time, 30 hour per week basis" after the May 1, 2003 effective date for the policy.  *Id.*  GE emphasized that to qualify as an "Employee," a person must regularly work at least 30 hours per week at the employer's usual place of business.  *Id.*  GE assumed that this 30-hour-per-week requirement was a condition precedent to coverage that could be satisfied only after the effective date.  *Id.* at 1012.  GE justified this assumption by connecting the Policy's definitions of "Employee," "Eligible Employee," "Actively At Work," and "Effective Date of Insurance".

The Tenth Circuit found that Mrs. Weber was hired and assigned to work a 40-hour week.  *Id.*  Her employer certified she was a regularly employed, full-time employee through May 16, 2003, and Mrs. Weber's time sheets confirmed that.  *Id.*  In other words, they showed that Mrs. Weber regularly worked 40-hour weeks before May 2003; thus, she "regularly" worked at least 30 hours a week.  Important to this case, the Tenth Circuit stated, "[t]hat illness or vacation might irregularly interrupt an employee's regular assignment does not change the 'regular' work experience of an employee."  *Id.*

As to Mrs. Weber's work after May 1, GE received reports that she worked less than 30 hours per week during a few weeks.  *Id.*  The Tenth Circuit found "[t]hat is not

enough, however, to cast doubt on the other evidence in the administrative record that Mrs. Weber 'regularly' worked at least 30 hours a week prior to May 1, the effective date of insurance. Nothing in the definition of Employee suggests that eligibility is limited to those who regularly work at least 30 hours a week after May 1." It further stated that "[i]f GE intended to require that the employee actually work 30 hours per week after the effective date to be an eligible employee, it 'had every opportunity to add' specific language to that effect.'" *Id.* (quoting *Fought*, 379 F.3d at 1013). "But because GE did not do so, it would be 'unreasonable to allow [GE] to do so post facto . . . .'" *Id. Weber* concluded that "[b]ecause Mrs. Weber unequivocally met the Policy's definition of Employee, GE's denial of benefits on the ground that she never satisfied that definition was arbitrary and capricious." *Id.* at 1013.

The Tenth Circuit also looked at whether it was arbitrary and capricious for GE to conclude that Mrs. Weber was not "actively at work" after the effective date of the policy. Among other things, the Court found that the evidence showed that Mrs. Weber was actively at work shortly after May 1. *Id.* The record further revealed that the employer "considered Mrs. Weber a full-time employee on those days." *Id.* While "Weber did not work 8 hours per day on any of those four days, she was nonetheless performing the duties of her job on a 'full-time basis.' Nothing in the administrative record suggests otherwise." *Id.* Further, relying on the policy's plain language defining "Actively At Work," the court observed that the definition did "not require that the employee work any set number of hours, either on a particular day or over the course of a particular week." *Id. Weber* concluded on this issue:

Coverage under the Policy hinges on whether the employee is 'Performing
all of [her] duties . . . on a full-time basis.' This language simply does not
equate to a requirement that the employee perform all of her duties *for a
full work day* or clock-in and actually work a set number of hours on any
day—it only requires that work be performed according to the employee's
duties on a full-time 'basis.' *Id.* The fact that the employer considered
Weber a full-time employee on days that she worked less than eight hours
a day meant that she was at work on a "full-time" basis on those days
because, regardless of the hours actually worked, she was "nonetheless
performing the duties of her job on a 'full-time basis.'"

*Id.*

The *Weber* Court found persuasive the reasoning in *Tester v. Reliance Std. Life
Ins. Co.,* 228 F.3d 372, 377 (4th Cir. 2000) (holding that "full-time" depended "on
whether or not she worked at [her job] on a *regular basis despite her sick leave*")
(emphasis in original). *See Weber*, 541 F.3d at 1014. Under *Tester's* definition, *Weber*
stated that the court had "little doubt that Mrs. Weber was an active, full-time employee
after May 1 despite her sick leave." *Id.*

The Tenth Circuit also found *Bartlett v. Martin Marietta Ops. Support, Inc. Life
Ins. Plan*, 38 F.3d 514 (10th Cir. 1994) persuasive on the "regular full-time" issue. In
*Bartlett*, the policy stated that an employee is "'considered a full-time employee if [he is]
regularly scheduled to work 40 hours in a week.'" *Weber*, 541 F.3d at 1014 (quoting
*Bartlett*, 38 F.3d at 516). Prior to the effective date of the policy, the employer placed
the employee on a medical leave of absence, and the employee did not return to work
before his death. *Id. Bartlett* rejected the administrator's assertion that "regular full-
time" employment was synonymous with "active" employment after the effective date.
*Id.* It noted that if the administrator wanted to limit benefits in that fashion, "it could have

done so" but did not.  *Weber*, 541 F.3d at 1014 (quoting *Bartlett*, 38 F.3d at 515-17).

Since it did not so qualify the term, the *Bartlett* Court gave the terms their "plain

meaning" and "decided that an employee out on disability leave was not precluded 'from

still being one of the company's regular full-time employees.'" *Id.* (quotation omitted).

"In so holding, the court noted that the employee 'was hired as a regular full-time

employee and was still shown to be a regular full-time employee in the company's

personnel records before his death.'"  *Weber*, 541 F.3d at 1014 (quoting *Bartlett*, 38

F.3d at 519).

Like the policies in *Weber* and *Bartlett*, the policy at issue contains no language

suggesting that "Active Full-time" work for six months or more requires continuous work

"uninterrupted by periods of absence from work due to the prior disability."[11]  Jefferson's

literal interpretation of that term would mean that if a returning employee returned to

work and missed one day or half a day of work due to disability at anytime during that

six month period, then any second period of disability would be deemed "recurrent" and

benefits paid at the same rate as for the first disability no matter how long the employee

returned to full-time work.  This is unreasonable and I find the interpretation to be

arbitrary and capricious under the authority of *Weber* and the cases relied on therein.

*See also United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America*, 894 F.2d 1555,

1565 (11th Cir. 1990) (finding active work requirement would not be construed to

terminate coverage for employees who were out on short-term sick leave and noting

---

[11]  Indeed, the policy states only that an "Active Full-time Employee" is "an employee who works for the Employer on a regular basis in the usual course of the Employer's business" and who worked the number of hours in the Employer's normal work week—in this case 30 hours per week (AR at 744).

that "'it would be unreasonable to assume that the parties intended a contract whereby any regular employee would be excluded during an week in which he did not work 30 hours because of illness, vacation, etc.'") (quotation omitted).

While Jefferson disputes that it actually interpreted the six month period in this manner, statements made in the redetermination letter appear to support Plaintiff's argument that the six month period was interpreted this way. For example, the December 2007 redetermination letter says that while the payroll records show that Plaintiff worked full time in December 1999, the Falkenberg affidavit shows that Plaintiff "had frequent absences due to illness or for treatment." (Ex. 13 to Pl.'s Mot. for Summ. J., at 17). Further, the letter refers to other times that Plaintiff had a doctor's appointment or medical treatment that is not reflected in the payroll records and/or periods of illness. (*Id.* at 17-19). These statements were made in an attempt to discredit the payroll records which show that Plaintiff was working full-time during that time period. Thus, it appears that Jefferson penalized Plaintiff during the relevant time period for taking sick leave and/or time off due to his disability.

The problem with Jefferson's finding that the six months of full-time employment must be uninterrupted by periods of absence from work due to the prior disability is further compounded by the fact that Jefferson failed to make specific findings as to the hours and/or days that Plaintiff actually worked. Thus, I am unable to determine exactly how Jefferson determined that Plaintiff did not work a consecutive six month period, and what "periods of absence" of Plaintiff may have impacted that determination.

Another issue also supports my determination that Jefferson's second interpretation of the six month period was unreasonable. That is Plaintiff's argument that the policy uses the term "continuous" in other contexts, and that by not using those words to qualify the six month period referred to in the definition of a "recurrent" claim, the Policy should be construed to not require a continuous six month period, uninterrupted by absence. I do not find this argument persuasive as to Plaintiff's reliance on the "Elimination Period" in the Policy (requiring 90 days of disability to be accumulated within a 180 day period). Jefferson has shown that provision has a different purpose from the "six month" term, as it is crafted to accommodate various scenarios under which an employee may become disabled.

However, Plaintiff also relies on a provision which states that the Plan's waiting period requires 90 days of "continuous" active work (AR at 0059). I find merit to Plaintiff's argument that Jefferson's use of the word "continuous" in that context shows that Jefferson was aware of the significance of that term, could have used that term in connection with the "six month" period at issue, and chose not to. As the Tenth Circuit noted in *Weber*, if Jefferson intended to require that the six month period be continuous and not include any periods of absence, it "had every opportunity to add" specific policy language to that effect and because [it] did not do so, it would be unreasonable to allow insurer to do so *post facto"*. *Weber*, 541 F.3d at 1012.

Finally, I have concerns with several other findings regarding the interpretation of the six month term. First, I agree with Plaintiff that Daly's statement in her redetermination letter that she found Hagemann's testimony confusing is unreasonable,

as Hagemann's testimony is very clear in the record.  Further, Daly cites no evidence to support her conclusion that Hagemann must have confused the six months in the recurrent provision with the 90 day elimination period.  These findings suggest further procedural irregularities and/or bias on the part of Jefferson which I have factored into my analysis.

Based upon the foregoing, I find error with Jefferson's interpretation of the six month term to exclude periods of absence from work due to the prior disability.  I also find evidence of procedural irregularities and/or bias in connection with Jefferson's interpretation of the six month period.  These must be weighed in connection with my review of the ultimate issue in this case—whether Jefferson's determination that Plaintiff did not return to work on a full-time basis for six months or more between September 20, 1999 and November 28, 2000 was reasonable or whether it was arbitrary and capricious.  With that in mind, I now turn to that ultimate issue.

E.   <u>Whether Jefferson's Decision that the Claim was "Recurrent" Based on a Finding that Plaintiff Did Not Work Full Time for Six Months or More Between Was Arbitrary and Capricious</u>

The ultimate issue in this case is whether the finding by Jefferson that Plaintiff did not return to work on full time basis for six months or more between his first and second periods of disability (September 20, 1999, and November 20, 2000), such that his claim was treated as "recurrent" and part of the prior Disability (as opposed to being a new period of disability) is arbitrary and capricious, factoring in the conflict of interest that Jefferson has.  Having carefully considered the record in this case and the argument of counsel at the hearing, I find that I should slide considerably on the sliding scale due to

the conflict at issue and the many procedural irregularities in the case. I further find for the reasons stated below that Jefferson's redetermination of this claim in its December 2007 letter is arbitrary and capricious. In so finding, I note that many of the same concerns discussed by Judge Figa and the Tenth Circuit in their decisions that Jefferson's prior determination was arbitrary and capricious exist in connection with the redetermination at issue.

I first discuss the evidence that supports Plaintiff's argument—that he worked six months or more during the relevant period and that his claim thus should have been treated as a "new" claim rather than a "recurrent" claim. The most obvious evidence is the payroll records. As discussed above, the Tenth Circuit found that those records "unequivocally indicated not only that DeGrado was paid for full-time work during the period in question, but that he actually worked more than thirty hours per week for more than six months." *DeGrado*, 451 F.3d at 1171. Further, it stated that "these payroll records clearly "support[ ] a conclusion that [DeGrado] did work full-time for most of the year 2000, and also reflect[] the onset of his illness and inability to work full-time commencing in November 2000." *Id*.

Although Jefferson's representative Daly spent considerable time in her letter detailing why she found that the payroll records were not credible, she completely ignored the Tenth Circuit's findings as to the payroll records.[12] I believe that some deference should have been given to the Tenth Circuit's findings about the payroll

---

[12] Further, she clearly had knowledge of the Tenth Circuit's opinion since she referred to it in connection with other issues.

records.  At the very least, Jefferson should have explained why it decided that the Tenth Circuit's findings were not entitled to any deference.  I also find that the *Weber* decision has further made clear the significance of payroll records in this type of case. *Weber*, 541 F.3d at 1012 (when employer certified that Weber was a regularly employed, full-time employee, showing that she regularly worked 40-hour weeks, then Weber "regularly" worked at least 30 hours a week as required for coverage).  Under this authority, I find that the payroll records were not given adequate weight by Jefferson in its redetermination letter.

Also as to the payroll records, Jefferson initially found that they supported a finding that Plaintiff worked 30 hours or more during the relevant period (in the March and April 2001 letters, AR 1296-97, 1726).  Further, Jefferson's representative Brenehy noted that "since there is no one at the company to verify he was working part-time, and since the payroll records reflect that he was full-time through December 2000, I think we would be hard pressed to prove that he was ineligible due to not working 30 hours per week" (AR 1415).  Jefferson was never able to find anyone from Sloans that disputed the accuracy of the payroll records.[13]  Instead, Jefferson relied on a patchwork of evidence (primarily from Brenehy's notes of her telephone conversations with Plaintiff and medical records) to support its finding that the payroll records were not accurate. As discussed below, I do not believe that was reasonable.

---

[13]  Even the affidavit of Falkenberg, Plaintiff's former supervisor, does not necessarily show that the payroll records were inaccurate, as discussed below.

As to the medical records, Daly relied on the fact that notes made in the records showed that Plaintiff was at times experiencing severe or even incapacitating symptoms related to his Crohn's disease or other illnesses. She appeared to again conclude (as she did in her December 2001 determination) that this necessarily meant that Plaintiff could not be working 30 hours a week during those periods. She made this conclusion despite the fact that the Tenth Circuit found that her prior conclusion to this effect was problematic. *DeGrado*, 451 F.3d at 1175 (noting as a factor in its decision that Jefferson's original determination was arbitrary and capricious that it "simply reached a general conclusion that DeGrado could not have, due to his physical symptoms, worked the number of hours reflected in his payroll records").

Indeed, it is unreasonable to infer from the fact that Plaintiff is experiencing symptoms from an illness, even when severe, that he must not be able to work full time. He could be working full time during that period with occasional sick days and/or working from home, as Plaintiff admitted that he had done (*see, e.g.*, AR 833). Courts have held that an employee's work at home must be factored into the total number of hours worked. *See Great-West Life Assur. Co. v. Levy*, 382 F.2d 357, 360 (10th Cir. 1967); *Masten v. Life Investors Ins. of America*, 474 F. Supp. 373, 378-80 (D.S.D. 1979). Indeed, full-time work does not require regular and continuous presence at work. So long as Plaintiff was able to fully perform his main duties and was available 30 hours a week, despite being absent on occasion because of illness or vacation, he would still be working full time during that period. *Id.*; *see also Weber*, 541 F.3d at 1012-1013.

Daly also relied on notes in the medical records that Plaintiff was unable to work or able to work only part time in concluding that Plaintiff must not have been working at least 30 hours a week for six months or more. I believe that those findings are also unreasonable. First, Plaintiff submitted affidavits from his doctors to Jefferson on remand that said that they did not know how many hours Plaintiff worked and that any comments in the medical records were not intended to be a quantification of time that Plaintiff worked at his job. (Exs. 4 and 5 to Pl.'s Mot. for Summ. J.) Daly did not adequately explain why these affidavits were discounted. Further, the statements about part time work or being unable to work (for example, Dr. Sable's statement in June 2000 that Plaintiff had been unable to work (AR 1375)) do not explain for how long Plaintiff had been unable to work and whether that meant that Plaintiff was taking sick days or sick leave.[14]

Second, a reference to part time work, without more, does not differentiate between a work week of 30 or 40 hours a week. While Ms. Daly construed these references to mean that Plaintiff was not working 30 hours a week, they could just as easily be construed to mean that Plaintiff was not working 40 hours a week. Indeed, there is evidence in the record that Plaintiff believed full-time work for his employer meant 40 hours a week. (AR at 1703.) Thus, it was unreasonable to assume that the reference to "part time" meant that Plaintiff was not working 30 hours a week. Further,

---

[14] Jefferson also relies on a statement in a medical record of Dr. Hopp that said Plaintiff was disabled since November 1999. However, Dr. Hopp submitted an affidavit and letter to Ms. Daly saying that this was a mistake in the record and that the correct date of disability was Nov. 2000. I think it was unreasonable to reject this evidence, since this is within the personal knowledge of Dr. Hopp and there is no reason in the record to believe that Dr. Hopp is not credible on this issue.

the reference to part-time work could also be construed to mean the time spent at the employer's place of business.  As stated above, there is evidence that Plaintiff was also working some at home, which would count in his hourly requirement.[15]

Further, it appears that Jefferson cited certain medical records and other documents in support of its position, *i.e.*, that Plaintiff's symptoms were incapacitating, while ignoring evidence in the same record that Plaintiff's position was improved or improving.  (*See, e.g.* AR at 1221—"The patient started on Remicade three weeks ago (4/18/00) and has noted a marked improvement. . . .; 1375—Crohn's colitis "is significantly improved after his first course of Remicade. . . . Plaintiff "was basically asymptomatic for about eight weeks").  Further, at times it appears that Jefferson mischaracterized certain records.  *See* Pl.'s Resp. to Jefferson's Mot. for Summ. J. at 21-22.

Also as to the payroll records, Jefferson found that they are not credible because they show Plaintiff actually worked 40 hours a week, not 30 hours as he claims. However, Jefferson ignores the fact that DeGrado was an overtime exempt employee compensated by based salary and commissions without set hours.  He was thus

_____

[15] This same analysis would apply to the affidavit of Rob Falkenberg, Plaintiff's former supervisor (AR 1113-14).  While he attested to the fact that after Plaintiff attempted to return to work full-time in December of 1999, he continued to have frequent absences for illness or for treatment, worked irregular hours and was allowed to work at home, again this does not necessarily mean that Plaintiff was not working at least 30 hours per week.  Indeed, Mr. Falkenberg's affidavit made no quantitative statements regarding the number of hours Plaintiff worked. Further, Mr. Falkenberg stated that Plaintiff fully performed all the main duties of his occupation although he sometimes worked from his house (*id.* 1114).  Finally, Falkenberg's reference to part time certainly could mean that Plaintiff was not able to work 40 hours a week.  There is nothing in the record that demonstrates Falkenberg was aware that full-time meant 30 hours a week in the context of Plaintiff's disability claim.

considered full-time and paid on that basis, regardless of the actual hours worked. The payroll records reflect full-time work by DeGrado, not hours derived from time cards. Further, the Tenth Circuit made clear in *Weber* that this does not provide a basis to reject the payroll records. Indeed, *Weber* found that if payroll records reflect that an employee is working 40 hours a week, he necessarily must regularly be working 30 hours a week. *Weber*, 541 F.3d at 1012.

Finally as to the payroll records, Daly discredited the records because they did not reflect times when Plaintiff had a doctor's appointment or medical treatment and/or periods of illness. However, sick leave or medical treatment would not necessarily be reflected in the payroll records, since an employee is generally given paid sick leave by the employer. This would particularly be true in Plaintiff's case since he was not paid on an hourly basis but was salaried.

Daly also rejected all of the evidence that Plaintiff provided which substantiated that he worked 30 hours per week or more during the relevant time period. For example, she rejected Plaintiff's affidavits on this issue (Exs. 2 and 3 to Pl.'s Mot. for Summ. J.) based substantially on a letter and notes in the claim file in February and March 2001 from representative Brenehy discussing the fact that Plaintiff had told her he worked only 10-15 hours a week (AR 853, 1729).[16] However, I note that at least one

---

[16] In one of his affidavits, Plaintiff denies that he made these statements to Brenehy. He explained that while there were weeks that he only spent 10-15 hours in the office, he regularly worked out of home during that time period and that his work hours averaged no less than 30 hours per week. (Pl.'s Mot. for Summ. J., Ex. 2.) Plaintiff also explained in an affidavit that while he indicated in his November 2000 claim for disability benefits that he was working from home a lot and working very few hours, this was not a reference to the entire period of his return from September 1999 through November 28, 2000. Instead, as substantiated by the payroll records, this referred to the time period just prior to submitting the claim. (*Id.*, Ex. 3.)

court found that this "does not necessarily make this veritable evidence upon which the Court can rely. . . ." *Cavaretta v. Entergy Corp. Companies' Benefits Plus Long Term Disability Plan*, No. Civ.A 03-1830, 2004 WL 2694895, at *7 (E.D. La. 2004). Indeed, there is another record of a phone call between Brenehy and Plaintiff where he said it was no problem for him to meet the 30 hour per week eligibility requirement (AR 1704). Thus, Brenehy's phone records are not as clear on this issue as Jefferson contends, and outright rejection of Plaintiff's affidavit on this issue appears not to have been reasonable.

Further, as Plaintiff notes, it is undeniable that Jefferson knew about these statements by Plaintiff when it made the initial decisions in March/April 2001 and rejected those statements in favor of the payroll records. Thus, I am not sure that reliance on those statement now is reasonable—at the very least its flip flop on reliance on these statements gives some credence to reduced deference being applicable to its determination. The same is true of Jefferson's decision to rely on the payroll records when expedient (*i.e.*, rejecting Plaintiff's March 24, 2004 affidavit as inconsistent with the payroll records, Ex. 13 to Pl.'s Mot. for Summ. J. at 11, § 5, ¶ A, 19, ¶ N), but then dismissing the payroll records in the same determination letter as not credible to support a finding that Plaintiff's claim that he worked full-time for six months or more during the relevant period.

Plaintiff also submitted other evidence which substantiated that he was working full-time (30 hours) for at least six months or more during the relevant period. Plaintiff attached affidavits from a co-worker, persons he did business with as well as a person

who lived with him during part of the relevant period. Jefferson gave those affidavits no credibility. I first note, as Plaintiff argues, that affidavit evidence from eyewitnesses may well be superior to mere hearsay file statements generated by an inherently conflicted administrator describing unsworn statements of the beneficiary. Second, I find the outright rejection of these affidavits based on bias or lack of personal knowledge to be unreasonable.

I first address the affidavit of Jackie Spangler ["Spangler"], a former girlfriend of Plaintiff who lived with him during part of the relevant period (from March 2000 through July 2001) and who saw Plaintiff regularly from September 1999 on. She stated "unequivocally and without hesitation that there can be no question that between September 1999 and November of 2009 John DeGrado put in at least 30, and more often, 40 hours at his job for more than 6 months." (Pl.'s Mot. for Summ. J., Ex. 6.) Jefferson rejected that affidavit entirely, asserting that "she had an intimate relationship" with Plaintiff, that Plaintiff "supported her financially for some time" and that her statements "are inconsistent with most other evidence in the record". ( *Id.*, Ex. 13 at 13.) However, at the time Spangler submitted this affidavit, she was no longer living with Plaintiff and the record does not reflect that she was even in a relationship with him. Thus, the inference of bias seems unfounded, as it does not appear that she had anything to gain from her testimony. Further, Spangler certainly had personal knowledge of Plaintiff's work schedule during the time that she lived with him and/or was dating him. Finally, there was evidence in the record which supported Spangler's assertions, including the payroll records. Thus, outright rejection of this evidence

appears to be unreasonable.  *See Crespo v. Unum Life Ins. Co.*, 294 F. Supp. 2d 980, 996 (N.D. Ill. 2003) (finding that administrator acted arbitrarily and capriciously in making adverse credibility determinations without sufficient factual basis and giving "specific reasons" for denying benefits which were logically unsound).

Jefferson also rejected an affidavit of a co-worker, John Tice, who opined that Plaintiff was working full-time.  (Pl.'s Mot. for Summ. J., Ex. 12.)  Certainly this co-worker would appear to have personal knowledge on the issue.  *See PAS Communications, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1181 (D. Kan. 2001) (a witness must have personal knowledge of a matter in order to testify about the matter, which includes inferences and opinions where they are "grounded in observation or other first-hand personal experience").  Further, I believe that the persons Plaintiff regularly did business with had at least some personal knowledge about Plaintiff's work hours (*id.*, Exs. 7 and 8), although I agree with Jefferson that they probably could not say for sure that he worked 30 hours or more regularly during the applicable period.

Ultimately, Jefferson rejected outright all the evidence that supported a finding that Plaintiff worked at least 30 hours a week, including the payroll records, the evidence provided by Plaintiff, and other evidence in the record of same.  Jefferson's ultimate determination that Plaintiff did not work 30 hours per week for 6 months or more would be more credible if it gave at least some credence to this evidence, *i.e.*, actually weighed this evidence, but concluded that the evidence to the contrary outweighed the evidence supporting Plaintiff's argument.  That is not what it did, and I find that this lends support to my finding that its determination about the hours worked is

unreasonable.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)

("Plan Administrators . . . may not arbitrarily refuse to credit a claimant's reliable

evidence. . .").

There are a number of other factors that I find support my determination that

Jefferson's decision that Plaintiff did not work 30 hours for six months or more during

the relevant time period was unreasonable and/or the result of biased decision making.

First, there is the very significant fact that Jefferson changed its position from Plaintiff's

claim being a "new" claim to a "recurrent" claim.  In connection with this change of

position, Jefferson also changed the Date of Disability from November 28, 2000 (as

stated in its March 1, 2001 letter) to January 5, 2000 (as stated in its December 13,

2001 letter).  This is certainly a significant procedural irregularity, and also may suggest

biased decision making on the part of Jefferson.  *See Kimber v. Thiokol Corp.*, 196 F.3d

1092, 1097 (10th Cir. 1999) (deference is to be reduced based upon "a plan's

inconsistencies in handling an applicant's claim").

The fact that this may have been based on biased decision making is particularly

true since the change from "new" to "recurrent" was made AFTER the unexplained cost

comparison in the claim file notifying Jefferson that it would cost over $2.8 million if the

claim were "new", as compared to a little over $600,000 if the claim were "recurrent."

The Tenth Circuit found that this fact lent support to the argument that Jefferson's prior

decision finding the claim to be "recurrent" instead of "new" was arbitrary and

capricious.  It lends just as much support to the fact that Jefferson's redetermination

may also have been based (at least in part) on this financial consideration which is reflective of bias.

Further, even though the determination that the claim was a "new" claim was not appealed, Jefferson gave no notice to Plaintiff that it was going to readdress this issue on appeal and determine whether it should be new or recurrent. Ultimately, of course, it concluded that the claim was "recurrent" rather than "new". I think that this also demonstrates procedural irregularities that show the significance of the conflict under which Jefferson was operating.

Another factor in connection with my analysis is Jefferson's rejection of findings of the Social Security Administration ["SSA"]. SSA found that Plaintiff was totally disabled and that his date of disability was November 28, 2000 (AR 0562-563), in accord with the March 2001 letter finding the claim to be a "new" claim. I agree with Plaintiff that Jefferson inconsistently takes offset credit for social security benefits awarded to DeGrado to reduce the amount it has to pay on benefits, but rejects the SSA's determination that DeGrado's date of disability was November 28, 2000. Instead, as stated earlier, it later picked January 5, 2000 as the date in order to treat the claim as "recurrent" with absolutely no explanation for how that new date was picked. The *Glenn* court recognized that a plan administrator's receipt of financial advantage from the SSA's finding of total disability and a subsequent decision to ignore findings of the SSA that support an employer's claim suggests procedural unreasonableness that justifies the court in giving more weight to the conflict. *See Glenn*, 128 S. Ct. at 2352.

I further note that there is no evidence in the record that supports Jefferson's decision that January 5, 2000 is Plaintiff's Date of Disability. Jefferson relies on Plaintiff's January 5, 2000 e-mail to the Colorado Department of Insurance (AR 0125). However, the January 5, 2000 e-mail does not indicate that he was disabled on that date. Instead, it states that Plaintiff is back at work, that Plaintiff was getting sick again and that he wants to know what Guarantee Life is going to do with his claim "in case I need to go back out" (presumably on disability). *Id.* It does not state that Plaintiff is going on disability that date or even state definitively that he will have to go out on disability at some point in the future. Finally on this issue, while Jefferson states that the evidence shows that Plaintiff started working part time in January 2000 per his statements to Brenehy and the affidavit of Falkenberg, the reasonableness of this evidence is questionable as discussed above.

Plaintiff also points out that Jefferson relies on documents in the social security claim file as proof of part-time work, but ignores records in the same file of full time work. (Doc. 199-14 at 10 ¶TT). Indeed, Plaintiff stated in his 2001 Disability Application that he worked full time from December 1999 through November 2000 (AR 0560, 0545). Thus, it appears that Jefferson may have selectively applied the evidence to support its determination.

Finally, Jefferson still failed to make specific findings about how many hours per week DeGrado actually worked during the time period at issue. The Tenth Circuit noted as a factor in connection with its conclusion that Jefferson's December 2001 decision was arbitrary and capricious that Jefferson "failed to explain precisely how Hagemann

reached her conclusion that DeGrado did not work full-time for at least six months following his first period of disability." *DeGrado*, 451 F.3d at 1175. More specifically, the Tenth Circuit found problematic the fact that there was no indication in that letter or anywhere in the administrative record of precisely how many hours per week that Plaintiff worked during the time period in question. *Id.*

Despite these findings by the Tenth Circuit and its clear statement that adequate factual findings needed to be made on remand, the redetermination letter still does not indicate how many hours per week that Daly found Plaintiff worked during the time period or attempt to make any analysis of this issue. Instead, the redetermination letter again relies on fragmentary evidence in the record and makes assumptions about what the medical records mean in a way that supports Daly's conclusion that Plaintiff could not have worked the number of hours reported by him and the payroll records. This plainly shows that Jefferson did not comply with the remand order and is, in my opinion, a further indication of biased decision making.

VII. <u>CONCLUSION</u>

Ultimately, while I recognize that there is evidence in the record which would support a finding that Plaintiff did not work full-time for at least 30 hours a week for six months or more, I find that when the present administrative record is considered along with the history of this case, the conflict of interest, the unreasonableness of the finding that the six month period must not include any periods of absence due to disability, and the numerous procedural irregularities in the case, I find that Jefferson's decision that Plaintiff's claim was recurrent, as he did not work for six months or more during the

relevant time period, was arbitrary and capricious.  As the Sixth Circuit noted and which I find pertinent to this case "[i]t is evident that defendant's conflict of interest arising from its dual role as administrator and insurer of the LTD policy interfered with an objective review of the record."  *Evans v. UnumProvident Corp.*, 434 F.3d 866, 879 (6th Cir. 2006).

The question then becomes the remedy.  The Tenth Circuit in *DeGrado* indicated that a case should be remanded where the plan administrator failed to make adequate factual findings or to adequately explain the grounds for its decision.  *DeGrado*, 451 F.3d at 1175.  Here, Jefferson has still failed to make adequate factual findings or adequately explain the grounds for its decision.  However, Jefferson has already been provided the opportunity to make such findings in connection with the remand of its first determination and failed to do so, despite clear indications from the Tenth Circuit that it must do so.  Accordingly, I have no confidence that Jefferson will do so if I remand the case to it yet again.

Further, I note that after the case was originally remanded, Jefferson initially made a determination that Judge Figa had to strike as he found that the procedures undertaken in connection with the determination exceeded the scope of the remand and conflicted with binding determinations made by him and the Tenth Circuit.  The redetermination is a second attempt on remand to get it right, *i.e.,* to comply with the Tenth Circuit's and Judge Figa's directions on remand, and Jefferson has still failed to so do.

At this point I conclude that remand would be futile.  I further find that the decisionmaking of Jefferson throughout this case has shown that the conflict that Jefferson is operating under is so pervasive that it has impacted Jefferson's ability to make a fair and well-reasoned decision.  *See Glenn*, 128 S. Ct. at 2351 ("the conflict of interest should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration").  Accordingly, I find that a remand at this point is no longer appropriate.  *See id*. at 2352 (affirming decision of Sixth Circuit to set aside decision of administrator rather than remand based on the serious concerns it articulated about the administrator's decision and the conflicting interests).

Plaintiff's Motion for Summary Judgment is thus granted, and Defendant's Motion for Summary Judgment is denied.  Jefferson's determination that Plaintiff did not full-time work for six months or more during the relevant period such that his claim is treated as "Recurrent" and part of his prior Disability is set aside as arbitrary and capricious.  Jefferson is ordered to treat Plaintiff's claim as a new period of disability under subparagraph 1 of the "Recurrent" provision at issue.

Jefferson is also ordered, within 30 days of this Order, to recalculate the benefits owed to Plaintiff under that provision and to pay Plaintiff accordingly going forward.  As to past benefits, Jefferson is ordered within 30 days of this Order to calculate the difference between the amount paid under its calculation that the claim was part of the prior disability under subparagraph 2 of the "Recurrent" provision and the amount that

would have been paid if the claim had been treated as a new period of disability under subparagraph 1.  Jefferson shall then pay this past-due amount to Plaintiff within 60 days of this Order.  If Plaintiff believes that interest is applicable on any portion of these payments, he may file a motion on that issue within ten (10) days of this Order.

Finally, as to Plaintiff's request for attorney fees and costs, ERISA provides in applicable part that the "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1).  Plaintiff shall file a motion and brief on the issue of whether attorney fees should be awarded, the amount of fees that Plaintiff seeks and the reasonableness of such fees, with supporting documentation, within thirty (30) days of this Order.  Jefferson shall file a response to this motion within twenty (20) days of the filing of the Motion.  Plaintiff may, if he wishes, file a reply within ten (10) days of the filing of the Response.

Based upon the foregoing, it is

ORDERED that Plaintiff's Post-Remand Motion for Summary Judgment is **GRANTED**.  In accordance therewith, Jefferson's determination that Plaintiff did not full-time work for six months or more during the relevant period such that his claim is treated as "Recurrent" and part of his prior Disability is set aside as arbitrary and capricious.  Jefferson is ordered to treat Plaintiff's claim as a new period of disability under subparagraph 1 of the "Recurrent" provision at issue. It is

FURTHER ORDERED that Defendant's Post-Remand Motion for Summary Judgment is **DENIED**.  It is

FURTHER ORDERED that Jefferson shall, within 30 days of this Order, or by **Monday, March 9, 2009**, recalculate the benefits owed to Plaintiff under that provision and pay Plaintiff accordingly going forward.  Also by **Monday, March 9, 2009**, Jefferson shall calculate the difference between the amount paid under its calculation that the claim was part of the prior disability under subparagraph 2 of the "Recurrent" provision and the amount that would have been paid if the claim had been treated as a new period of disability under subparagraph 1.  Jefferson shall then pay this past-due amount to Plaintiff within 60 days of the Order, or by **Monday, April 6, 2009**.  It is

FURTHER ORDERED that if Plaintiff believes that interest is applicable on any portion of these payments, he may file a motion on that issue by **Tuesday, February 17, 2009**.  Finally, it is

ORDERED that as to Plaintiff's request for attorney fees and costs, Plaintiff shall file a motion and brief on this issue, with supporting documentation, within thirty (30) days of this Order, or by **Monday, March 9, 2009**.  Jefferson shall file a response to this motion within twenty (20) days of the filing of the Motion.  Plaintiff may, if he wishes, file a reply within ten (10) days of the filing of the Response.

Dated:  February 5, 2009

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge